**STATE of Indiana ex rel. The ATTORNEY GENERAL of the State of Indiana, Relator,**

v.

**The LAKE SUPERIOR COURT and The Honorable Robert Pete, As Judge Thereof, Respondents.**

**Governor of the State of Indiana, et al., Appellants (Defendants below),**

v.

**Miller Citizens Corporation, et al., Appellees (Plaintiffs below).**

Nos. 45S00–0405–OR–204, 45S00–0405–CV–224.

Supreme Court of Indiana.

Jan. 13, 2005.

Stephen A. Carter, Attorney General of Indiana, Gary Damon Secrest, Joby Jerrells, Deputy Attorneys General, Indianapolis, IN, Attorneys for Relator in No. 45S00–0405–OR–204.

John S. Dull, Merrillville, IN, George Patrick, Crown Point, IN, Attorneys for Respondent and Appellee The Treasurer of Lake County.

Kenneth D. Reed, Harold Abrahamson, John P. Reed, Hammond, IN, Gregory S. Reising, Douglas M. Grimes, Gary, IN, Attorneys for Respondent and Appellee Miller Citizens Corporation.

Robert G. Berger, Highland, IN, Attorney for Respondent and Appellee Common Council of the City of Hammond.

Joseph Allegretti, Indianapolis, IN, Attorney for Respondent and Appellee Common Council of the City of East Chicago.

Stephen A. Carter, Attorney General of Indiana, Gary Secrest, Joby Jerrells, Ted Holaday, Douglas Webber, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellants Governor of Indiana, Attorney General of Indiana, Department of Local Government Finance in No. 45S00–0405–CV–224.

Thomas Atherton, Ronald M. Soskin, David Suess, Indianapolis, IN, Attorneys for Appellant United States Steel Corporation.

Larry J. Stroble, Michael V. Knight, Indianapolis, IN, Attorneys for Appellant International Steel Group, Inc.

Jeffrey T. Bennett, Indianapolis, IN, Attorney for Appellant BP Products N. America, Inc.

Francina A. Dlouhy, James H. Ham, III, Christopher A. Ruhl, Indianapolis, IN, Attorneys for Appellant Ispat Inland, Inc.

William Clyde Jones, Gary, IN, Attorney for Appellee Common Council of the City of Gary.

## ON PETITION FOR WRIT OF MANDAMUS AND PROHIBITION.

BOEHM, Justice.

In 2001, the General Assembly passed two statutes that applied only in Lake County and provided for countywide reassessment of property for tax purposes to be conducted by the Department of Local Government Finance and by private contractors selected by the DLGF. The plaintiffs are a group of taxpayers who brought an action in April 2004 in Lake Superior Court seeking a declaratory judgment that these statutes are unconstitutional. The bills for taxes due in 2003 had not yet been mailed due to delays in the reassessment process and the plaintiffs asked that the taxing authorities in that county be enjoined from mailing bills for the property taxes due in 2003.

The trial court found the statutes to violate five separate provisions of the Indiana Constitution and granted the requested preliminary injunction. The At-

torney General contended that exclusive jurisdiction over this case lies in the Tax Court and on that ground asked this Court for a writ of mandamus and prohibition. While that writ proceeding was pending, an appeal of the preliminary injunction was also initiated. This Court stayed the trial court's preliminary injunction. As a result the taxing authorities were free to mail the bills for taxes due in 2003. We then ordered the writ proceeding and the appeal to be argued concurrently. This opinion addresses both.

We hold that the Lake Superior Court had no jurisdiction to entertain these claims. We recognize that ordinarily lack of jurisdiction of the trial court would preclude deciding any other issues. However, this case presents a challenge to the entire assessment process in Indiana's second most populous county. For the reasons explained below, we think it is clear that the plaintiffs will ultimately fail in their effort to enjoin the tax bills produced by the 2002 countywide reassessment. It is not in anyone's interest to preserve false hopes by resolving this appeal on jurisdictional grounds alone. In short, there is broad public interest in a prompt resolution of this case, and the parties ask us to address the merits of the plaintiffs' claims without regard to jurisdiction. For these reasons we do so without delaying a final resolution of this matter.

We conclude that the statutes providing for private parties or the DLGF to assess certain assets in Lake County violate one of the provisions of the Indiana Constitution on which the plaintiffs rely, but not the other four. Although the 2001 laws violated Article IV, Section 22 of the Indiana Constitution as special legislation providing for the assessment of taxes, in 2004 the General Assembly passed a statute authorizing the assessment conducted pursuant to the 2001 legislation. This "cu-rative" legislation validated the acts taken under the unconstitutional special legislation. Moreover, plaintiffs waited until reassessment was completed to seek injunctive relief. In the meantime, other taxpayers and local government units relied on the ongoing reassessment process provided by statute to supply funding for essential day-to-day functions of government. For that reason as well, plaintiffs' claim for injunction was barred by the delay in seeking equitable relief.

## Factual and Procedural Background

In broad brush, the amount of property taxes owed for each individual property is set by allocating the total amount of property taxes to be raised in a taxing district among all pieces of property in proportion to their assessed valuations. If the total to be raised increases, of course the sum of all tax bills in the district goes up by that amount. But, the total amount to be raised is unaffected by a reassessment of property valuations. If all assessed valuations go up or down by the same percentage as the result of a reassessment, even if there is a large change in the dollar amount of the assessed valuation on each property, there is no change in the tax burden of any individual property. In simplified terms, if the assessed valuation of every property doubles, it would have no effect on the tax bills of any of them. If, however, some assessed valuations go up or down more than others, as is always the case in the real world, some taxes go up and some go down, but the gains by those whose assessed valuations go down more than the average are offset by losses among those whose assessed valuations increase more than the average. In other words, reassessment is a zero sum game for all property in the affected area.

As explained in more detail below, Lake County has for several years had a history of uneven assessments and generally lower

assessed valuations than those in other parts of the state for similar properties. In response to this situation, the two challenged provisions were enacted by the 2001 session of the General Assembly in the same law, H.B.1902. Both by their terms apply only in counties with populations between 400,000 and 700,000, and Lake County is the single county meeting that criterion. The two statutes now appear as Indiana Code section 6–1.1–4–32 (2004), which authorized the DLGF to employ private firms to assess real property in Lake County, and Indiana Code section 6–1.1–8.5–1 *et seq.*, which provided for the DLGF itself to assess industrial properties in Lake County with an estimated assessed value in excess of $25 million.

Indiana property taxes are due in May and November of each year based on assessed valuations as of March 1 of the preceding year. Both of the challenged statutes provide procedures that formed a part of the process of determining the assessed valuation of property in Lake County as of March 1, 2002. The 2002 reassessment was completed, although later than usual, by a private firm selected by the State Board and by the DLGF. In practical terms, the issue here is that the reassessment resulted in proportionally lower assessed valuations of some large industrial properties in Lake County compared to the changes in assessed valuations of some residential properties, notably those owned by the plaintiffs. As a result, the 2003 taxes increased for the owners of properties whose changes in assessments were proportionally higher. For some properties, these new taxes were dramatically higher than their historic levels. The State points out that if the reassessment is accurate, the increase in taxes compared to prior years merely corrects an underpayment these residential properties have enjoyed in the past. The plaintiffs counter that the effect of in-

creased taxes is to lower the market value of their residential properties because most homes are purchased based on the monthly cash payments required for principal and interest on a mortgage plus taxes and insurance. An increase in taxes means a potential purchaser has less available for monthly mortgage payments and therefore produces a reduced market value of the property.

Article IV, Section 22 of the Indiana Constitution prohibits "local or special laws" dealing with a number of subject matters, one of which is "providing for the assessment and collection of taxes...." Article IV, Section 23 provides that even if a law does not address one of the Section 22 items, it nevertheless must be a general law "where a general law can be made applicable." Finally, Article X, Section 1 directs the General Assembly to "provide, by law, for a uniform and equal rate of property assessment and taxation...." Plaintiffs brought this action in Lake Superior Court, contending that these two statutes violate each of these three provisions, and two others as well. For that reason they claim that the collection of the 2003 property taxes in Lake County must be enjoined. The State responds that the trial court lacks jurisdiction over this case. The State also contends that the statutes are constitutional, and in any event the resulting assessed valuations are correct, so there is no point in redoing the assessment by some other agency that would, after some extended time, arrive at the same results, and in the meantime severely interfere with the day-to-day operation of local government in Lake County.

After a hearing in which no testimony was taken, the trial court granted a preliminary injunction. The State first asked this Court, pursuant to Original Action Rule 1(A), for a writ of mandamus and prohibition, contending that the trial court

lacked jurisdiction based on the plaintiffs' failure to exhaust administrative remedies. The State also initiated an appeal of the preliminary injunction pursuant to Appellate Rule 14(A)(5). Because the preliminary injunction was based on a holding that a statute was unconstitutional, the appeal also is directly to this Court. App. R. 4(A)(1)(b). We granted the State's request for a stay of the trial court's preliminary injunction, permitting the tax bills to be mailed. We then consolidated the argument on the two proceedings and now address both in this opinion.

The parties do not dispute the underlying facts. The issues relating to the jurisdiction of the trial court and the merits present only questions of law.

## I. Jurisdiction of the Trial Court

Plaintiffs brought this suit contending their properties were incorrectly assessed and therefore their soon-to-be mailed tax bills were too high. The statute creating the Tax Court provides that that court has "exclusive jurisdiction over any case that arises under the tax law of this state and that is an initial appeal of a final determination" of the Indiana Board of Tax Review. Ind.Code § 33–3–5–2 (2003).[1] Other statutes provide in some detail the procedure for contesting an assessment of property. These include an appeal from county determinations to the Board, and a provision in Indiana Code section 6–1.1–15–5(b) for review of challenges to assessments by the Tax Court "under I.C. 4–21.5–5." This refers to the Judicial Review chapter of the Indiana Administrative Orders and Procedures Act which includes Section 4(a) requiring exhaustion of administrative remedies before judicial review may be initiated. In *State v. Sproles,* 672 N.E.2d 1353, 1357 (Ind.1996),

we held that a taxpayer wishing to contest a tax must first exhaust administrative remedies, and that these statutes collectively deprive the other trial courts of this state of jurisdiction over any case that "principally involves collection of a tax or defenses to that collection." As explained in *Lake County Property Tax Assessment Board of Appeals v. BP Amoco Corp.,* 820 N.E.2d 1231, 2005 WL 67440 (No. 49S10–0309–TA–00400) (Ind. Jan. 13 2005), handed down today, a challenge of the sort plaintiffs bring in this case is properly presented in the first instance to the Indiana Board of Tax Review. Accordingly, judicial review lies exclusively in the Tax Court. *See also State Bd. of Tax Comm'rs v. Mixmill Mfg. Co.,* 702 N.E.2d 701, 702 (Ind.1998); *Winski Bros. v. Bayh,* 679 N.E.2d 912, 915 (Ind.Ct.App. 1997). In 2001, after these decisions, the statutes discussed above were amended to substitute the Board of Review for the State Tax Board as the agency entertaining property tax appeals from local taxing authorities, but the language conferring exclusive jurisdiction on the Tax Court and requiring exhaustion of administrative remedies was preserved without change. Pub.L. No. 198–2001, § 98, 2001–2 Ind. Acts 1293, 1407. We perceive no legislative dissatisfaction with the construction of that provision we made explicit in *Sproles,* and find it controlling here.

Plaintiffs contend that the Lake Superior Court, as a court of general jurisdiction, has jurisdiction "over the constitutionality of these statutes." Precisely the same claim was advanced and rejected in *Sproles,* 672 N.E.2d at 1357. That case involved a claim, asserted in a court of general jurisdiction, that a tax could not be collected because the constitution prevent-

---

1. P.L. 98–2004 repealed and recodified Title 33. Effective July 1, 2004, this section ap-

pears at Ind.Code § 33–26–3–1 (2004).

ed its collection. The claim in *Sproles* was that the constitutional ban on double jeopardy prevented collection of the Controlled Substance Excise Tax where the taxpayer had been convicted of a crime for possession of the same marijuana that was the subject of the tax. We held that such a case "arises under" the tax laws and therefore must be brought in the Tax Court after exhaustion of administrative remedies. *Id.* at 1361. The sole relief the plaintiffs seek here is an injunction against the collection of property taxes, and their claim is that the assessed valuations of Lake County property are invalid because the assessment was done pursuant to unconstitutional statutes. These constitutional issues are asserted as the basis of defense to the collection of the property taxes. Just as Mr. Sproles did, Plaintiffs here seek to bring their claim in a court of general jurisdiction to enjoin collection of a tax.

The trial court concluded that this case involves assessments, not taxation, and therefore *Sproles* was inapplicable. As already noted, the statute governing challenges to assessments, I.C. § 6–1.1–15–5 (2004), expressly incorporates the exhaustion requirement as to challenges to assessments. Assessments, just as other challenges to a tax, are routed through the Board of Tax Review, and we see no distinction for these purposes between a challenge to assessments, whether procedural or substantive, and any other basis to contest a tax.

We are equally unpersuaded by Plaintiffs' suggestion that it makes a difference that the tax in *Sproles* was a "listed tax" regulated by the Department of Revenue, rather than the property tax administered through the Board of Tax Review. The same statutory language imposes jurisdictional restrictions on both types of tax. Both are subject to the same requirement of exhaustion of administrative remedies and both are subject to the exclusive jurisdiction of the Tax Court by the same language in Indiana Code section 33–3–5–2(a) (2003), which applies that language to both listed taxes in subsection (a)(1) and to property taxes in subsection (a)(2).

In summary, the question whether the Tax Court jurisdiction is exclusive is purely a matter of legislative intent. In 1996, we held that the purpose of the 1986 legislation creating the Tax Court was to consolidate tax litigation in one forum, and deprive the courts in various locations around the State of jurisdiction to address these issues. *Sproles,* 672 N.E.2d at 1357. Despite his claim that resort to his administrative remedy was futile, Sproles was required to exhaust administrative remedies and present his constitutional claims to the Tax Court. *Id.* at 1361. That result is dictated by the General Assembly, and the same statutes govern the plaintiffs' claim here.

## II. The Merits of Plaintiffs' Claims

■■■■ Failure to exhaust administrative remedies is a defect in subject matter jurisdiction. *M–Plan, Inc. v. Ind. Comprehensive Health Ins. Ass'n,* 809 N.E.2d 834, 837 (Ind.2004) (citing *Austin Lakes Joint Venture v. Avon Utils., Inc.,* 648 N.E.2d 641, 644 (Ind.1995)). Accordingly, the trial court was without jurisdiction to entertain this claim, and a writ of prohibition is properly requested. *State v. Allen Superior Court,* 699 N.E.2d 1134, 1135 (Ind. 1998). Plaintiffs request us to address the merits of their contentions, even if the trial court lacked jurisdiction. We agree we should do so. The issues have been fully briefed by the parties and by the intervenors, and a resolution of the merits of these contentions is in the public interest.

### A. *Special Legislation Under Article IV of the Indiana Constitution*

Both Section 22 and Section 23 of Article IV of the Indiana Constitution prohibit

"special" legislation under some circumstances. Plaintiffs contend that the statutes providing for DLGF to assess industrial property and for private contractors to be hired to assess residential property are local or special legislation as that term is used in both sections. We agree that these laws are "special" for purposes of Article IV. The statutes authorizing the 2002 reassessments by their terms applied only in counties of population between 400,000 and 700,000, and Lake County is the only such county. To be sure, some statutes applicable only to areas with specified populations may be justifiable as special legislation, because the parameters rationally relate to the subject matter of the legislation. They may also be viewed as "general legislation" if the subject matter is one that is rationally related to population, such as the basic structure of local government. So, as we observed in *City of South Bend v. Kimsey*, 781 N.E.2d 683, 694 (Ind.2003), the Unigov statute, which applies only to counties with cities of the first class, and therefore only to counties with cities of certain size, may properly be viewed as a general law even if it applies in practice in only one place. By hooking the defining characteristic (in Unigov a city of the first class) to the justifying characteristic (rational desire for more expansive and encompassing form of metropolitan government), legislation applicable in only one county may over time become applicable in others. Here however, the apparent reasons for limiting the application of the statutes in question are not related to population. Rather, they plainly derive from the troubled history of property taxation in Lake County discussed below. Thus, the rationale for population-based statutes relating to the organization of local government do not apply here, and the law, applicable only in Lake County, is "special" legislation whether it describes Lake County by name, by population parameters, or by some other unique characteristic. *Id.* at 692.

### 1. Local laws providing for the assessment and collection of taxes

Article IV, Section 22 provides a list of subjects as to which "local or special laws" are prohibited. Among these are laws "providing for the assessment and collection of taxes...." The State argues that Section 22 does not apply to the statutes in question here because the Section is written in the conjunctive, prohibiting local laws that "provide for the assessment and collection of taxes." Because there is no "collection" aspect to these laws, the State contends Section 22 is inapplicable. We do not agree. The constitutional debates make clear that lack of uniform assessment practices was one of the principal concerns underlying both Article X, Section 1, and Article IV, Section 22. *See, e.g., Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana,* Vol. II at 1290 (1850), where Douglass Maguire, a delegate from Marion County, finding "great inequality in the assessment and taxation of property," called for checks upon county assessors through a Board of Equalization to value all real property on an equal basis. Although "and" is normally taken as conjunctive, it may be read as disjunctive if the context makes clear that is the legislative intent. *See, e.g., State v. Myers,* 146 Ind. 36, 38, 44 N.E. 801, 801–02 (1896); *Brook v. State,* 448 N.E.2d 1249, 1251 (Ind.Ct.App.1983).

We think the history of Section 22 makes clear that it was addressed to local laws dealing with either assessment of property or collection of taxes, or both. Section 22 had no counterpart in the 1816 Constitution and appeared for the first time in the Indiana Constitution as a result of the 1851 Constitutional Convention. It

was the product of widespread dissatisfaction with the large number of laws passed by the legislature in the early days of this State dealing with purely local subjects. Many of these imposed or authorized local taxes for specific projects, typically roads or schools. Others addressed a variety of other special and local interests, even granting divorces.

■ To "assess" property is to value it. *Merriam Webster's Collegiate Dictionary* 69 (10th ed.1993). To "assess" a tax is to impose it. *Id.* Thus, as a matter of syntax, Section 22's reference to laws "providing for the assessment and collection of taxes" may be read to deal only with laws passed for the imposition or collection of taxes, and not the valuation of property for tax purposes. However, in *State v. Hoovler*, 668 N.E.2d 1229 (Ind.1996), we addressed a claim that Section 22 prohibited a statute raising the maximum local county option income tax rate to 1 .25% in Tippecanoe County from the 0.7% rate applicable statewide. The effect was to permit county authorities to adopt an additional 0.55% local income tax. After a review of the historical roots of Section 22, this Court held that this statute, though a local law, did not violate Section 22 because it did not "authorize any new property valuations or changes in the system of tax gathering." *Id.* at 1233. The authorization of an increase in the rate of an existing tax was not the "assessment and collection" of a tax. Indeed, we specifically referred to a dictionary of the time, noting that "assessment" includes "valuation of property . . . for purpose of taxation." *Id. Hoovler* thus made clear that local laws dealing with assessment of property for tax purposes were prohibited by Section 22. This is of course consistent with the history of Section 22, as variations in assessment procedures were the most frequently cited reasons for the need for constitutional limits

on local legislation. Accordingly, we agree with plaintiffs that these provisions constitute special legislation "providing for the assessment and collection of taxes," and therefore violate Article IV, Section 22 of the Indiana Constitution. For the reasons explained in Parts III and IV, however, the reassessments conducted under these statutes are not invalid by reason of this flaw in the statutes.

2. *Special laws under Article IV, Section 23*

■ Plaintiffs contend these laws also violate Article IV, Section 23, which requires that "where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." As we held in *Kimsey*, under Section 23, a law limited to a given county is prohibited unless "there are inherent characteristics of the affected locale that justify local legislation." *Kimsey*, 781 N.E.2d at 692. If the affected county reflects unique circumstances that rationally justify the legislation, then a general law is not "applicable" elsewhere and Section 23 is not violated. *Id.*

The State points to the long and tortured history of property taxation in Lake County, described in *Matonovich v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1093, 1095 (Ind. Tax Ct.1999) as "an endemic problem with the uniformity of assessments within classes of property." As explained above, if some parts of a county significantly underassess properties compared to the assessed valuations placed on similar properties elsewhere, the effect is to shift tax burdens from the underassessed properties. Indeed, that was the complaint of the town of St. John, which is in Lake County, that led to the initial holding that the then-prevailing "true tax value" system of assessment did not produce a uniform and equal method of as-

sessment in violation of Article X, Section 1 of the Indiana Constitution. *Boehm v. Town of St. John,* 675 N.E.2d 318, 324 (Ind.1996).

██ Until 2001, the State Tax Board had the functions of both the Board of Tax Review and the DLGF. In 1998, the State Board had concluded, after public hearings, that widespread underassessment in various units of Lake County required ordering a countywide reassessment, and had employed a private contractor to reassess all property in Lake County. Though noting the State Board's finding that there was "a widespread recognition that an assessment problem exists in Lake County," the Tax Court concluded that the Board had no authority to employ a private firm to perform the reassessment. *Matonovich,* 705 N.E.2d at 1098. In response to that decision, the General Assembly promptly granted the Board the authority the Tax Court found lacking by enacting the statutes Plaintiffs challenge in this case. We thus have administrative findings, judicial findings, and legislative action all pointing to a unique circumstance created by uneven assessment practices in various parts of Lake County. And, as Plaintiffs point out, a few huge industrial complexes in Lake County constitute significant percentages of all taxable property in some taxing districts, a situation not faced in any other county, and requiring great care in valuing such a dominant asset of unique kind and character for which there is no ready market comparable to that for residential housing. We are directed to no comparable set of circumstances in any other county producing such widespread tax inequities and unusual issues of valuation. These conditions readily justify local legislation to deal with a reassessment problem of a scale and complexity not found elsewhere in the state.

### B. *Other Constitutional Challenges*

██ Plaintiffs contend without much explanation that these statutes violate Article X, Section 1 of the Indiana Constitution. That section requires a "uniform and equal rate of property assessment and taxation." We have held that the system of property taxation must be based on a system that causes "each taxpayer's property wealth bear its proportion of the overall property tax burden." *Town of St. John,* 675 N.E.2d at 324. There is no basis to conclude that the statutes in question produce a disproportionate assessment. Different procedures to accomplish a reassessment based on the same substantive rules of valuation do not violate that provision. Indeed, this Court has held that the goal of statewide uniformity and proportionality trumps a local government's authority to value property. *Zoercher v. Agler,* 202 Ind. 214, 225–26, 172 N.E. 186, 190–91 (1930). The end result—a "uniform and equal rate" of assessment—is required, but there is no requirement of uniform procedures to arrive at that rate. To the contrary, the power of local authorities to implement tax laws is purely statutory in nature. The only constitutional constraint under Article X, Section 1 is upon the State itself, which must provide a uniform and equal rate of assessment, but may provide whatever procedures are appropriate consistent with the other provisions of the Constitution.

██ For the same reason that these statutes do not violate Article IV, Section 23, they also do not violate Article I, Section 23, which requires that legislative classifications be reasonably related to inherent characteristics that define the class. Plaintiffs do not elaborate on these claims and we are left to surmise what the classification may be. Taking the complaint at face value, the class appears to be Lake County taxpayers compared to those in all

other counties. As explained above, given the long history of systematic underassessment in parts of Lake County, there is abundant reason to provide for reassessment of property in that county by means different from those applied in other counties. The statutes thus satisfy the first prong of the requirements of Article I, Section 23. The separate treatment of Lake County is "reasonably related" to its "distinguishing characteristics." *Collins v. Day,* 644 N.E.2d 72, 80 (Ind.1994).

Plaintiffs also advance an argument, not clearly tied to any specific constitutional provision, the substance of which is that local assessors would recognize the adverse effect that lowering valuations of industrial properties would have on some residential properties. This is compounded, plaintiffs say, by the fact that this reassessment was performed by two different agencies, private contractors for residential properties and DLGF for industrial property. They claim a constitutional right to have locally elected officials perform the assessments. There are several things wrong with this claim. First, valuations, whether made by local authorities or by others, are as of March 1 of a given year. Any shift in valuations caused by tax bills in the future is a matter for future reassessments. Second, this argument boils down to a claim that these plaintiffs have a right to preferential treatment under the property tax laws. That is precisely the contention rejected by other taxpayers, including the residents of St. John, who felt disadvantaged by selective underassessments in parts of Lake County and claimed those disparities violated their rights to uniform and equal taxation. Without a showing that the substantive results reached by the reassessments are incorrect, we will not indulge the assumption that local officials would arrive at a different result. Finally, there is nothing in the Constitution that guarantees an as-

sessment by locally elected officials. The clerk of the circuit court, auditor, recorder, treasurer, sheriff, coroner, and surveyor are required by Article VI, Section 2 to be "elected, in each county." There is no such requirement as to assessors. Indeed, at some points in the history of this state the disparities created by local assessors responding to local election pressures created demand for a statewide equalization board to eliminate the resulting unfairness. Justin E. Walsh, *The Centennial History of the Indiana General Assembly 1816– 1978,* 102–04 (1987).

■ Plaintiffs' claim that these statutes violate Article I, Section 21 against "taking" of property without compensation is frivolous. It is well established that taxation is not a "taking" within the meaning of this provision. *Hutchins v. Town of Fremont,* 194 Ind. 74, 83, 142 N.E. 3, 6 (1924); *Bd. of Comm'rs of Jackson v. State,* 147 Ind. 476, 492, 46 N.E. 908, 912 (1897); 5A *Ind. Law Encyclopedia,* Constitutional Law § 446, at 427 (1984). The properties remain in the hands of the owners, and their use is unaffected by the reassessment.

Finally, Plaintiffs advance a number of arguments questioning the wisdom of the legislation, but raise no constitutional issue. For example, they claim that local authorities should be given the opportunity to perform the assessments. They also question the lack of taxpayer awareness of the effect of reassessment based on the fact that many homes are mortgaged and the mortgagees, as escrow agents, receive the tax notices. These claims present no legal issue. The policy arguments must be directed to the General Assembly, not this Court. Plaintiffs' other claims, such as the unconstitutionality of the homestead tax credit, were not presented to the trial court and are not available on appeal.

### III. The 2004 Law as Curative Legislation

A general law could readily have been crafted in 2001 that would have accomplished what the General Assembly attempted to do. As explained in Part II. A.2, Lake County has a long and troubled history of assessment of property, including findings of the State Board as early as 1998 that systematic underassessment required a countywide reassessment. A statute applicable to all counties permitting the use of contracted private assessors or permitting the DLGF to perform that function where such a finding is made would be a general law not subject to Article IV challenge as special legislation. In 2004 such a law was passed.

Indiana Code section 6–1.1–4–35 (2004), applies by its terms to a county "other than a county subject to section 32 [I.C. § 6–1.1–4–32]." At the time this law was passed, presumably the intent of this exception was to exclude Lake County, which, as explained in Part II, is the only county that meets the population parameters of "section 32." Because section 32 violates Article IV, Section 22, however, no county is "subject to section 32" and section 35 applies by its terms to Lake County and all ninety-one other counties. Moreover, section 35(v) specifically provides that "the provision of this section are severable as provided in I.C. § 1–1–1–8(b) [the general severability statute]." Pursuant to Section 35(v), we are to sever any invalid portions of section 35. If section 35 were inapplicable in Lake County, it would constitute special legislation for the same reasons section 32 runs afoul of Article IV, Section 22 of the Indiana Constitution. Based on the effort in 2001 to accomplish essentially the same thing for Lake County, we think it clear that the General Assembly would prefer statewide application of section 35 to its statewide invalidity.

Accordingly, even if section 35 is read to exclude Lake County, that exclusion would fall, for the purpose of preserving the statute.

Section 35 provides for DLGF to order a State-conducted reassessment for a county if it determines that the local officials are unable to complete the reassessment by October 2003 or are likely to complete reassessment in an "inaccurate manner." The DLGF is authorized to contract with private parties to perform the reassessment. Nothing precludes the DLGF from performing a part of the reassessment itself and contracting for others. The DLGF was thus authorized by the 2004 legislation to do substantially the same things in Lake County that were in fact done under color of section 32. We are unwilling to fortify the armory of those who attack the law as famous for its ability to elevate form over substance. We see no basis to trigger the disruption that would be generated by invalidation of the entire county's property tax base where there is no showing that any identifiable property has been incorrectly assessed. Indeed, what plaintiffs seek is court preservation of a system of taxation that was held invalid six years ago in *State Board of Tax Commissioners v. Town of St. John*, 702 N.E.2d 1034 (Ind.1998).

The 2004 law acts as curative legislation by authorizing actions taken pursuant to an unconstitutional statute. "A curative act is a statute passed to cure defects in prior law, or to validate legal proceedings, instruments, or acts of public and private administrative authorities. In the absence of such an act the statute would be void for want of conformity with existing legal requirements.... [A] curative act may validate any past action which the legislature might have authorized beforehand." 2 Norman J. Singer, *Statutes and Statutory Construction*, § 41.11, at

466–67 (6th ed.2001). This Court has adopted Judge Cooley's test for curative acts:

> If the thing wanting or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the legislature might have dispensed with by prior statute, then it is not beyond the power of the legislature to dispense with it by subsequent statute. And if the irregularity consists in doing some act, or in the mode or manner of doing some act, which the legislature might have made immaterial by prior law, it is equally competent to make the same immaterial by a subsequent law.

See State ex rel. Harris v. Mutschler, 232 Ind. 580, 590–91, 115 N.E.2d 206, 210 (1953) (citing 2 Thomas M. Cooley, Constitutional Limitations at 775–76 (7th ed.)). A curative act should be liberally construed. Mutschler, 232 Ind. at 591, 115 N.E.2d at 210. A curative or validating statute is a species of retrospective legislation, "but that does not make such a curative act unconstitutional unless violating some constitutional provision such as impairing the obligation of a contract or the taking of property without due process." Martin v. Ben Davis Conservancy Dist., 238 Ind. 502, 512, 153 N.E.2d 125, 130 (1958); See Muncie Nat'l Bank v. Miller, 91 Ind. 441, 446 (1883). Therefore, when passing curative legislation the legislature may recognize and validate a de facto condition or status. There are limitations to this doctrine. For example the legislature cannot authorize an unconstitutional act, Martin, 238 Ind. at 513, 153 N.E.2d at 130, or cure a jurisdictional defect in a court proceeding, Seitz v. Mosier, 192 Ind. 416, 421–22, 136 N.E. 840, 842 (1922). But none are applicable here. The legislature plainly could have authorized statewide reassessments under the procedures of section 35.

The relevant point here is that the legislature may pass curative legislation that validates official acts performed pursuant to an act which a court later determines is unconstitutional so long as the curative statute does not suffer from any of the same defects as the original law. Thus, in Martin, the 1947 legislature passed an act that gave trial courts the authority to establish conservancy districts and appoint their directors and appraisers. Subsequently, the Court held that the 1947 law violated the requirement, since removed from Article IV, Section 19 of the Indiana Constitution, that the subject of every act "shall be expressed in the title." State ex rel. Pa. R.R. Co. v. Iroquois Conservancy Dist. Court, 235 Ind. 353, 359, 133 N.E.2d 848, 851 (1956). In response, the legislature passed the Conservancy Act of 1957 which by its terms authorized the conservancy districts established pursuant to the 1947 act and legalized prior acts of the board of directors for those districts. This Court held that because it was within the legislature's prerogative to establish the conservancy districts in 1947, it was also within the power of the General Assembly to cure any constitutional defects by passing curative legislation that meets constitutional requirements. Martin, 238 Ind. at 512, 153 N.E.2d at 130. Similarly, this Court in Mutschler, 232 Ind. at 591, 115 N.E.2d at 210, upheld a general law that legalized consolidated school districts that were defectively formed due to improper notice or invalid elections. It was within the legislature's discretion to dispense with those requirements for consolidation, so it was permissible to validate consolidations that had taken place without them, although they were required at the time the consolidation originally took place. Id.

In Fahlor v. Board of Commissioners of Wells County, 101 Ind. 167, 171–72 (1885), this Court declared that the proceedings

and orders of the Wells County board were void because the board was not in a regular or special session when it approved the construction of a road. The next year, however, in *Johnson v. Board of Commissioners of Wells County,* 107 Ind. 15, 26 8 N.E. 1, 6 (1886), this Court upheld legislation passed one month after the decision in *Fahlor,* to legalize the proceedings of the county board as to the gravel road. The Court held that curative legislation is invalid if it "materially interferes with or overthrows vested rights, creates and imposes new burdens, or infringes upon the judicial department of the government." *Johnson,* 107 Ind. at 19, 8 N.E. at 5–6; *see also* 5A *Ind. Law Encyclopedia,* Constitutional Law § 272, at 188 (1984). But in the absence of any of these, a curative law salvages actions taken under defective statutes or in disregard of procedural requirements that are not required by due process. This reasoning has been specifically followed by the United States Supreme Court in sustaining curative laws authorizing assessments for tax purposes. In *Williams v. Supervisors of Albany,* 122 U.S. 154, 164, 7 S.Ct. 1244, 30 L.Ed. 1088 (1887), the Court stated: "It is only necessary . . . to consider whether the assessment could have · been ordered originally. . . . If [the statutory flaws] were not essential to any valid assessment, and therefore might have been omitted or performed at another time, their omission or defective performance may be cured by the same authority." And curative legislation has been specifically upheld to validate acts taken pursuant to laws later held to be special legislation. *See Marfa Indep. Sch. Dist. v. S.T. Wood,* 135 Tex. 223, 141 S.W.2d 590, 592 (1940).

██ In sum, in 2004 the Legislature authorized the DLGF to contract with private parties to perform property value reassessments or to conduct reassessments itself in counties where DLGF determines that local officials are unable to complete the reassessment by October 2003 or are likely to complete reassessment in an "inaccurate manner." The DLGF did find widespread unequal assessment practices in Lake County, and pursuant to section 32 the county's property values were reassessed. The legislature had the power to authorize the DLGF to order the reassessment of property values in Lake County at the time it passed section 32. It therefore also had the power to cure the constitutional defect of the act by enacting section 35. Accordingly, the 2002 reassessment is valid subject to any individual errors in assessment that are determined in the normal review process.

The doctrine of curative legislation permits the legislature in effect to ratify a previously unauthorized reassessment. This produces no injustice. There are unconstitutional statutes and unconstitutional statutes. The constitutional flaw claimed here is not that the plaintiffs' property is incorrectly valued, or that the assessments violated the substantive requirement of Article X that they be "uniform and equal." Indeed there is no showing that the result would be different if the local assessors had done the job and done it properly. The constitutional issue is merely a claimed lack of authority of the persons who carried out the assessment under color of a statute that had never been declared unconstitutional at the time they acted. Moreover, as we hold today in *Department of Local Government Finance v. Commonwealth Edison Co. of Indiana,* 820 N.E.2d 1222, 1226, 2005 WL 67130 (No. 49S10–0307–TA–293) (Ind.2005), the law permits an appeal of a property owner's assessments even if the basis of that appeal is an incorrect assessment of other properties. The law thus affords a remedy for any inequity. But that remedy is not upsetting the entire fiscal structure of

the county, which would be the result if some taxpayers are assessed on the basis of pre-reassessment values and those who are pleased with the reassessment get its benefits.

## IV. Appropriate Relief

The injunctive relief granted by the trial court is inappropriate for reasons apart from lack of jurisdiction. Both the balance of benefits and burdens and the doctrine of laches preclude the injunctive relief awarded by the trial court. These are different ways of making the legal point that this lawsuit for declaratory judgment and injunction comes far too late in the process to obtain the result the plaintiffs seek. Plaintiffs cannot wait until the eve of the date on which already overdue tax bills are to be sent out to launch an attack on a process that has been underway for over three years and is critical to the operation of government.

### A. *Injunctive Relief is Improper*

Although we find the statutes authorizing these assessments to violate Section 22, we are given no basis to conclude that a different result would be produced by a reassessment by local authorities. The trial court found, presumably correctly, that the effect of the reassessment is to increase taxes on some properties compared to the taxes on the same property for prior years. But there is no finding that the reassessment done pursuant to these statutes produced a different result from the assessments that will ultimately prevail if the tax bills are enjoined. Indeed, if the local authorities do their jobs properly, and the reassessment was done properly, there is no basis to conclude they would reach a different result for any specific piece of property. Of course, one can conjecture that there might be differences, but there is no basis to conclude what those differences would be, at least without imputing improper motives to the local authorities. As the State points out, the provisions governing the values to be placed on property are applicable statewide. The only effect of the statutes the plaintiffs attack is to change the agency that performs the assessment, not the substance of what the assessor is to do. Indeed, we have no basis to conclude that the assessed valuations produced by the DLGF or the private firm are any different from what would have been produced by a timely assessment if the local authorities had been able to produce one, or would be produced by a reassessment in the future.

 As a matter of basic equity law, and the law of preliminary injunctions, courts must consider the relative benefits and burdens of granting injunctive relief, even if the plaintiffs are correct. *See Ind. Family & Soc. Servs. Admin. v. Walgreen Co.,* 769 N.E.2d 158, 161 (Ind.2002). A court, considering an application for preliminary injunction "will consider the traditional balance of convenience; this is to say, it will consider whether a greater injury would be done by granting the injunction than would result from a refusal to do so." 43A C.J.S. *Balancing Equities, Inconvenience, Hardship, or Injury–Temporary or Preliminary Injunction or Restraining Order* § 82, 102 (2004). Equity courts are traditionally free to balance equities and hardships in determining whether or not to grant an equitable remedy. Dan D. Dobbs, *Law of Remedies,* § 2.4(1), at 91 (2d ed.1993). Moreover, injunctive relief is equitable in nature, and courts will not exercise that authority to produce useless results. *State ex rel Board of Sanitary Commissioners of Terre Haute v. Superior Court of Vigo Cty.,* 247 Ind. 617, 220 N.E.2d 336 (Ind.1966). Given that the new law, which became effective June 30, 2004, would permit the DLGF to redo the

entire reassessment and arrive at the same place, injunctive relief must be denied on that ground alone. "The jurisdiction of a court of equity extends no farther than is necessary to do some equitable thing; it has no jurisdiction to do useless, unjust, and inequitable things." *In re Hawkins Mortgage Co.*, 45 F.2d 937, 940 (7th Cir. 1931). "It is an age old axiom that equity will not do a useless thing." *Townsend v. Quern*, 473 F.Supp. 193, 198 (N.D.Ill.1979). An injunction is to be denied if the public interest would be substantially adversely affected, even if the plaintiff has a claim. *Fumo v. Medical Group of Mich. City, Inc.*, 590 N.E.2d 1103, 1108 (Ind.Ct.App. 1992).

## B. *Laches*

■ Finally, just as in any other case seeking equitable relief, undue delay in seeking the relief may bar relief. Here the plaintiffs brought this suit on April 29, 2004, seeking to enjoin the Lake County Treasurer from sending out tax bills that should have been due in March 2003. But due to delays in reassessment, the tax bills were already over a year late. The claim is that these two statutes, on the books since 2001, were unconstitutional. Rather than seeking to enjoin the implementation of these reassessment procedures, the plaintiffs waited until they were completed, no other reassessment having been conducted, and then sought to enjoin the collection of 2003 taxes already over one year delayed. This is a classic case for invoking of the equitable doctrine of laches.

■ Laches is an equitable doctrine. Unlike statutes of limitations, it does not principally turn on time alone. Rather, if a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the other party, laches may bar the claim. *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind.Ct.App.

1996). As early as 1996, the need for reassessment was obvious as a result of this Court's decision in *Boehm v. Town of St. John*, 675 N.E.2d 318 (Ind.1996). The basic fact of the legislature's provision for reassessment in Lake County by private contractors and the DLGF was in the public record and widely publicized since 2001. The county's taxing authorities are now dependent on the results of that process to move forward, if belatedly, to proceed with the ordinary process of funding government. Under these circumstances laches bars granting of an injunction based on facts and theories available to the plaintiffs three years earlier.

### Conclusion

The preliminary injunction entered by the trial court is vacated. This case is remanded with instructions to dismiss the complaint for lack of jurisdiction.

DICKSON, J. concurs.

SHEPARD, C.J., and SULLIVAN J. concur in Part I with separate opinion by SULLIVAN, J.

RUCKER, J. concurs in Parts I, II, and IV, and dissents as to Part III with separate opinion.

SULLIVAN, Justice, concurring in Part I.

I concur with the Court's earlier decision to vacate the trial court's injunction entered in this case and permit Lake County property tax authorities to mail property tax bills based on the new assessments that are challenged in this case. I also concur in part I of the Court's opinion. More specifically, I agree that the Legislature has deprived Indiana trial courts of jurisdiction to review the claims advanced by the taxpayers in this case. The *Sproles* case is clear and unequivocal precedent on this point.

At the same time, I agree with the Court that taxpayers whose property has been incorrectly assessed can appeal their assessments through administrative channels. This Court in *Dep't of Local Gov't Fin. v. Commonwealth Edison Co. of Ind.*, No. 49S10–0307–TA–293, 820 N.E.2d 1222, 1226–27 (Ind. Jan. 13, 2005), makes clear that the remedy is available even if the reason a taxpayer contends the taxpayer's assessment is too high is that other property in the township or county is assessed contrary to law. (The Department of Local Government Finance made clear in its filings in this case that it was prepared to review the assessments of over 5,000 Lake County residential taxpayers before the trial court's injunction in this case brought the proceedings to a halt. *See* Reply Br. of Relator–Appellants at 4.)

I recognize that it appears unwieldy if not unfair that taxpayers who believe they have been wrongly assessed—particularly, as in this case, where they believe they have been assessed pursuant to an unconstitutional statute—must go through several layers of administrative review before being allowed to appeal to the Tax Court. Indiana trial courts review claims of unconstitutionality all the time; why, the plaintiffs ask, should their claim be reviewed differently?

The short answer is, of course, that the Legislature has said so, and under our laws, it is up to the Legislature to determine the jurisdiction of Indiana trial courts. *See* Ind. Const., art VII, §§ 1, 8. But sound reasons explain why the Legislature established this procedure. Protests over taxes are frequent and yet taxes are needed to provide public safety and other public services. A system that channels tax protests through an orderly system of administrative and Tax Court review without risking abrupt stoppages in tax collections by order of any one of the state's hundreds of trial courts protects the interests of both taxpayers and of all of us who rely on government services. Furthermore, utilizing an orderly system of administrative and Tax Court review allows the executive and legislative branches to effect compromises of tax controversies, rather than have the answers dictated by (a variety of) courts.

It is in part because I believe that taxpayers and the executive and legislative branches should have maximum freedom to effect compromise of this tax controversy that I think the Court is wrong to reach the merits of the various constitutional claims advanced. More than a century ago, this Court said:

> Courts will not pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. This court has repeatedly held that questions of this character will not be decided unless such decision is absolutely necessary to a disposition of the cause on its merits.

*State v. Darlington*, 153 Ind. 1, 4, 53 N.E. 925, 926 (1899); *accord, Elk Grove Unified Sch. Dist. v. Newdow*, —— U.S. ——, ——, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004) (*quoting Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)); *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable."); *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 916 (Ind.2001); *Indiana Wholesale Wine & Liquor Co. v. State ex rel. Indiana Alcoholic Bev. Comm'n*, 695 N.E.2d 99, 106 (Ind.1998); *Citizens Nat'l*

*Bank v. Foster,* 668 N.E.2d 1236, 1241 (Ind.1996).

Because a decision on the points discussed by the Court in Parts II through IV are unnecessary to the determination of this case, I express no opinion with respect thereto.

SHEPARD, C.J., concurs.

RUCKER, Justice, concurring in part and dissenting in part.

I respectfully dissent from part III of the majority opinion. In all other respects I concur.

The 2002 reassessment of real property in Lake County has resulted in a dramatic increase in the property tax obligations for most Lake County homeowners in general and the homeowners to this litigation in particular. In one instance a homeowner's tax bill increased by an astounding 208%, and in another instance by an even more astounding 559%.[2] The tax increase has had a devastating impact on the ability of many homeowners to meet their monthly mortgage payment obligations. For others, it may mean losing their homes altogether. This turn of events is not necessarily the result of entities other than the elected Assessors conducting property tax reassessments. Rather, it is the result of a shift in the tax burden to local homeowners from what has been referred to as "The Big Four" (United States Steel Corporation; Ispat Inland, Inc.; International Steel Group, Inc.; and BP Productions of North America, Inc.).

To be sure, the 2002 reassessment and the resulting shift in the property tax bur-

den were not unanticipated. In a 1996 study commissioned by the then State Board of Tax Commissioners (now the Department of Local Government Finance, "DLGF"), researchers predicted that the adoption of a market value methodology for the assessment of real property, provided no other changes in the tax code were adopted, would result in an average statewide increase of 39% in tax obligations for residential property owners. 3 Appellants' App. at 10. That estimate was later adjusted to reflect an estimated 33% property tax payment increase statewide. *Id.* Notably, the researchers observed, "Lake and Crawford Counties stand out as having the highest residential tax shifts, 91.7% and 73.7%, respectively." *Id.* at 187. The reason for the estimated 91.7% tax shift in Lake County was apparently due in part to the business and residential "multipliers" used in the formula for determining market value assessments. Both multipliers were higher in Lake County than in any other county in the State of Indiana. With respect to the accuracy of these multipliers, the researchers concluded:

> If anything, the business multiplier used in the baseline scenario overstates the actual business multiplier in Lake County. Replacing the multipliers used in our analysis with the multipliers [relied upon by the State experts' assessment] would reduce the homeowner shift in Lake County from 91.7% to 76.4%, which still would be the highest shift among Indiana counties.

*Id.* at 187–88.

The record before us is silent regarding whether and to what extent the DLGF

---

**2.** For example, the property taxes of homeowners D.E. and N.E. increased from $2000 to $9000; homeowner M.F.'s tax obligation increased from $2400 to $5000; homeowner M.G.'s tax obligation increased from $1050 to $4320; homeowner B.H.'s tax obligation increased from $3756.48 to $11,460.08; home-

owner E.R.'s tax obligation increased from $2706 to $9267.90; the taxes of homeowners K.S. and D.S. increased from $1800 to $4600; and the taxes of homeowners S.W. and A.H. increased from $2700 to $15,089. R. at 55–61.

took into account the results of its study and the researchers' observations as it began to craft a property assessment scheme that more accurately measures property wealth. Equally important, the record does not reveal the formulae or methodology used by the DLGF to assess the value of the real property holdings of the "Big Four."[3] We do know that the reassessments resulted in tax shifts among some Lake County homeowners far in excess of those predicted by the researchers. We also know the "Big Four" were provided with "special rules for the assessment and taxation of industrial facilities...." Indiana Code § 6–1.1–8.5–13. The fact that special rules were fashioned for industrial facilities coupled with the lack of any indication the DLGF relied on its own study to develop the new property assessment system is significant in my view because not only the assessed values of properties, but also the tax rates at which properties are assessed, may be affected by who conducts the assessments and under what rules the properties are assessed.

Having made the foregoing observations, I nonetheless agree with the majority that injunctive relief is not an available remedy in this instance. And I do so largely based upon the reasons the majority explains. However, the majority has declared, on the basis of curative legislation, that "the 2002 reassessment is *valid* subject to any *individual errors in the assessment* that are determined in the normal review process." Op. at 1254 (emphasis added). Not only is the majority's "curative legislation" analysis not applicable in this case, but also by using this vehicle to validate the 2002 assessments, the majority forecloses the most potent argument available to homeowners entitling them to administrative relief, namely: because the assessment statutes are unconstitutional, the taxes collected pursuant to the statutes are illegal as a matter of law.

### A. Curative Legislation

First, although the Legislature certainly has the authority to enact curative legislation, there is nothing in the text of the statute to suggest the Legislature intended section 35 to serve that function. By specifically declaring that section 35 applied to a county "other than a county subject to section 32 [Lake County]" it is clear section 35 was intended as an exception to section 32 not a "cure" of any perceived constitutional infirmity.

Second, to say that the "DLGF was thus authorized by the 2004 legislation to do substantially the same things in Lake County that were in fact done under the color of section 32," Op. at 1252, is simply not supported by the language of the statute. Section 32 as it existed in 2002 specifically dictated that Lake County assessors "may not appraise property, or have property appraised...." The only duty of the local assessors was "to provide [the DLGF] or [the DLGF's] contractor ... any support and information requested by the [DLGF] or the contractor." *Id.* By contrast, under the 2004 legislation there is no absolute prohibition placed on local assessors from conducting reassessments. Rather, the DLGF "may order a state conducted reassessment in the county" if it determines a reassessment is necessary.

---

**3.** There are three accepted methods by which to determine the value of real property: the cost approach, the sales comparison approach, and the income approach. "All three of these approaches, when properly processed, should produce *approximately* the same estimate of value." *See* State Board of Tax Commissioners, *2002 Real Property Assessment Manual* at 3 (2002), *available at* http://www.in.gov/dlgf/reassessment/approved_manuals/index.html (emphasis added).

I.C. § 6–1.1–4–35(e). Even then, provided the local assessors act before the DLGF orders a state conducted reassessment, the local assessors may "enter into a contract with a professional appraising firm to conduct a reassessment. . . ." I.C. § 6–1.1–4–35(i). And that contract "is as valid as if it had been entered into by the [DLGF]; and [ ] shall be treated as the contract of the [DLGF]." *Id.* In essence, the newly enacted statute, which supposedly applies statewide, essentially gives local assessors an "opt-out" provision. Nothing resembling such a provision exists in the Lake County-only statute. Thus, while it is true the DLGF may order a statewide reassessment under section 35, it does not have carte blanche authority to conduct the reassessment itself or to hire contractors for that purpose. Rather, unlike section 32, under section 35 local Assessors still play a significant role in the assessment of local property.

Finally, and perhaps most importantly, section 35 certainly has not "cured" the constitutionally defective I.C. § 6–1.1–8.5–1 et seq. This statute, which has undergone no substantial revision since its enactment, provides "special rules" for the assessment of the "Big Four." And the assessments conducted under this statute apparently have been the greatest contributor to the significant tax increases for homeowners in Lake County. A DLGF ordered reassessment of property today could not include this Lake County-only provision. In sum, the doctrine of curative legislation saves neither I.C. § 6–1.1–4–32 nor I.C. § 6–1.1–8.5–1 et seq.

### B. Available Remedies

Indiana Code § 6–1.1–15–1 et seq. sets forth the procedures for review and appeal of property tax assessments. Among other things, a taxpayer may file a Form 133 Petition to request a correction of errors for one or more of the following reasons:

(1) The description of the real property was in error.

(2) The assessment was against the wrong person.

(3) Taxes on the same property were charged more than one (1) time in the same year.

(4) There was a mathematical error in computing the taxes or penalties on the taxes.

(5) There was an error in carrying delinquent taxes forward from one (1) tax duplicate to another.

(6) The taxes, as a matter of law, were illegal.

(7) There was a mathematical error in computing an assessment.

(8) Through an error of omission by any state or county officer the taxpayer was not given credit for an exemption or deduction permitted by law.

I.C. § 6–1.1–15–12(a).

Even though injunction may not be an available remedy, the fact remains that the property taxes imposed in this case are based on unconstitutional reassessment statutes. "An unconstitutional act is not law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *State v. Steinwedel,* 203 Ind. 457, 180 N.E. 865, 867 (1932). Consequently, the property taxes assessed pursuant to these unconstitutional statutes are illegal "as a matter of law." *See* I.C. § 6–1.1–15–12(a)(6). It is on this ground that the homeowners here should be entitled to relief. And the relief should entail payment of property taxes due and owing based on the preexisting assessments with appropriate refunds for all or a portion of tax installments already paid under the

2002 assessments. *See* I.C. § 6–1.1–26–1(4)(B). In the meantime there is nothing to prohibit DLGF from ordering a State conducted reassessment under the provisions of Indiana Code § 6–1.1–4–35 enacted in 2004.

The majority suggests that homeowners have an available remedy under the authority of *Department of Local Gov't Fin. v. Commonwealth Edison Co. of Ind.*, 820 N.E.2d 1222, 2005 WL 67130 (No. 49S10–0307–TA–293) (Ind. Jan. 13, 2005). However, it appears to me that *Commonwealth Edison* must be read in conjunction with *Lake County Prop. Tax Assessment Bd. of Appeals v. BP Amoco Corp.*, 820 N.E.2d 1231 (No. 49S10–0309–TA–00400) (Ind. Jan. 13, 2005). And as I read *BP Amoco*, only if at least one taxpayer has already timely filed a Form 130 petition challenging the methodology used in generating the 2002 Lake County assessments, and only if through the administrative review process there is a determination that the taxpayer is entitled to relief, then and only then may the homeowners in this case possibly be afforded relief by filing Form 133 petitions. *Id.* at 820 N.E.2d at 1236–37.

In sum, as I understand the majority's position, although the taxes in this case were assessed under unconstitutional assessment statutes, that fact alone has no practical consequence. Rather, in order to obtain relief, homeowners must advance an argument independent of the statutes' unconstitutionality. I cannot endorse this view. It is small comfort to these homeowners for the Court to declare in one breath that the challenged statutes constitute unconstitutional special legislation, a proposition with which I agree, and in the next breath declare the functional equivalent of "so what." Accordingly, I respectfully dissent from Part III of the majority opinion. In all other respects I concur.