**RAINBOW COMMUNITY, INC.,**
**Appellant–Defendant,**

**v.**

**TOWN OF BURNS HARBOR,**
**Appellee–Plaintiff.**

**No. 64A03–0707–CV–312.**

Court of Appeals of Indiana.

Feb. 26, 2008.

Jennifer L. Evans, Michigan City, IN, Attorney for Appellant.

Charles F.G. Parkinson, Harris Welsh & Lukmann, Chesterton, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Rainbow Community, Inc. (Rainbow), appeals the trial court's judgment in favor of Appellee–Plaintiff, Town of Burns Harbor (Burns Harbor), on Burns Harbor's request for an injunction, professional fees, and attorney fees.

We reverse and remand.

### ISSUE

Rainbow raises two issues on appeal, one of which we find to be dispositive: Whether the trial court erred in ordering Rainbow to perform a closed circuit television test (CCTV test) on its permanent sewer line without first hearing all of Rainbow's evidence in opposition.

## FACTS AND PROCEDURAL HISTORY

Rainbow owns Rainbow Mobile Home Park (the Park) in Burns Harbor, Indiana. Burns Harbor's sewer use ordinance—Ordinance 172—requires property owners to obtain a written permit from the town before connecting to the town's sewer system and states that such a permit "shall not become effective until the installation is completed to the satisfaction of the Town Engineer or designated representative of the town." (Appellant's App. p. 41). In the fall of 2004, Rainbow began preparations to connect the Park's private sewer system to Burns Harbor's public sewer system. On November 23, 2004, Lee Nagai (Nagai), Burns Harbor's engineer, sent Rainbow's engineer a letter stating, in part, "[Burns Harbor] will require all sanitary sewer testing be performed in the presence of the town engineer. (low pressure air test, [mandrel] test, manhole vacuum test)[.]" (Appellant's App. p. 86).

Rainbow wanted to connect to Burns Harbor's sewer system by December 31, 2004, because Burns Harbor had exempted connections made by that date from the $1000 per unit "tap on" fee. With 32 lots in the Park, Rainbow stood to avoid $32,000 in tap on fees. However, Rainbow discovered that Burns Harbor's sewer system was eighteen inches higher than the Park's existing system and determined that it would have to install a lift station in order to make the connection. Rainbow also determined that as a result of this additional work, it would not be able to connect the Park to Burns Harbor's sewer system by December 31.

To allow Rainbow to connect after December 31, 2004, but still avoid the tap on fees, Rainbow and Burns Harbor negotiated an agreement. On December 15, 2004, at a meeting of the Burns Harbor Sanitary Board, the terms of the agreement were discussed, and Nagai explained that Rainbow would be required to reimburse Burns Harbor for the cost of "observing required testing, low pressure air test, [mandrel] test and manhole vacuum test." (Appellant's App. p. 60). On December 23, 2004, Nagai sent a letter to Rainbow's engineer following up on the December 15th board meeting. The letter reiterated, "[Burns Harbor] will require all sanitary sewer testing be performed in the presence of the town engineer. (low pressure air test, [mandrel] test, manhole vacuum test)[.]" (Appellant's App. p. 87).

On December 29, 2004, the parties executed their Sanitary Sewer Connection Agreement (Agreement). The Agreement provided that Rainbow would construct and connect a temporary sewer line by the December 31 deadline and would construct and connect the permanent sewer line by February 25, 2005. Burns Harbor agreed to waive the tap on fees for all 32 of the Park's lots if those deadlines were met. As security for its performance, Rainbow agreed to post a bond of $32,000, the total of the potential tap on fees for the Park. The Agreement further provided that all construction would be done "in accordance with [Burns Harbor's] rules, regulations and specifications." (Appellant's App. p. 70). However, no specific tests were required by the Agreement. Finally, the Agreement stated that Rainbow would "pay the reasonable attorney's fees and other professional fees incurred by [Burns Harbor] in connection with the negotiation of [the Agreement]." (Appellant's App. p. 70).

As required by the Agreement, Rainbow completed the construction and connection of its temporary sewer line by December 31, 2004. Furthermore, as of February 21, 2005, Rainbow had completed the construction of its permanent sewer line and passed a low pressure air test and a manhole vacuum test, but it had not yet com-

pleted a mandrel test. On February 23, 2005, at an informal meeting of the Burns Harbor Sanitary Board, Nagai made the following comments regarding Rainbow's construction:

I have been out to look at his work[,] and his work is very nice. I am very happy with the work he has done. The permanent system is in, the lift station is in, the electric service is there. He is [all ready] to go; all the other tests have been completed. The only thing he is waiting for is his [mandrel] test.

. . .

[M]y recommendation would be that we don't make that permanent line active until after it has passed the [mandrel] test, and continue to operate on the temporary system and wait until the [mandrel] test is done. Then once you pass the [mandrel] test you can make the switch over.

(Appellant's App. p. 93).

Nagai further explained that "[t]he standard testing procedure for a [mandrel] test is you install the pipe in the ground, back-fill and wait 30 days, then [mandrel] test it." (Appellant's App. p. 93). Jacob Pasternac (Pasternac), Rainbow's president, expressed his concern that, if he had to wait thirty days to perform the mandrel test, his permanent sewer line would not be connected by the February 25, 2005, deadline and Burns Harbor would call his $32,000 bond. The board members in attendance—there was not a quorum—informed Pasternac that Rainbow had complied with the Agreement and that the board would not call Rainbow's bond because of the delay in the mandrel test.

The next day, February 24, 2005, Nagai sent a letter to the Burns Harbor Town Council. The letter provided, in pertinent part:

Per the recommendation of the town engineer, the project owner will wait until the new gravity sanitary sewers have successfully passed the required mandrel test before abandoning the temporary infrastructure and placing the permanent infrastructure into service. The new gravity sanitary sewers may be mandrel tested after 03–04–2005. Should the new sanitary sewers fail the mandrel test, the project owner shall correct the problem before placing the new sanitary sewers into service.

(Appellant's App. p. 89). On April 8, 2005, in Nagai's presence, Rainbow's permanent system passed the mandrel test. Rainbow switched over from the temporary system to the permanent system that day. Three days later, on April 11, 2005, Pasternac received a letter from Nagai informing him that Rainbow would be required to perform a CCTV test on its permanent system and submit a videotape to Burns Harbor as a record. The letter also stated, "We apologize for any confusion regarding the required CCTV test and corresponding video tape submission." (Appellant's App. p. 71).

As of August 2005, Rainbow had neither performed the CCTV test nor paid any of the bills sent to it by Burns Harbor allegedly arising from its connection to Burns Harbor's sewer system. As such, on August 9, 2005, Burns Harbor filed a Complaint against Rainbow alleging that Rainbow was in violation of Ordinance 172 for failing to perform a CCTV test and for failing to pay all of the "legal and engineering fees" associated with the connection. (Appellant's App. p. 14). Burns Harbor requested, among other things, that the trial court require Rainbow to perform a CCTV test and to pay Burns Harbor's "professional and attorney fees[.]" (Appellant's App. p. 14). Burns Harbor also asked the trial court to "require specific performance of the terms of

the Agreement by [Rainbow]." (Appellant's App. p. 14).

On June 1, 2006, the parties appeared for a bench trial on Burns Harbor's Complaint. Nagai testified that he had never given Rainbow permission to switch over to its permanent system but that he had discovered that Rainbow had already made the switch. Burns Harbor's attorney claimed that Burns Harbor had not previously known this and had filed suit with the understanding that Rainbow was still operating its temporary line, and he stated his belief that Rainbow was "operating on a permanent system that's never been authorized or approved by the town." (June 1, 2006, Transcript p. 92). The parties ran out of time and determined that the trial would need to be continued. However, the trial court suggested that, in the interim, Burns Harbor's attorney file a petition for an emergency injunction under the existing cause number. The second day of trial was set for November 2, 2006.

The next day, June 2, 2006, Burns Harbor's attorney faxed an Emergency Motion for Injunctive Relief to the trial court, asking the trial court to require Rainbow to, among other things, conduct a CCTV test within seven days or have its permanent sewer line disconnected from Burns Harbor's sewer system. Burns Harbor's attorney coordinated a hearing for Tuesday, June 6, 2006, at 1:00 p.m. with the trial court. Burns Harbor's attorney faxed a copy of the motion and notice of the hearing to Rainbow's attorney at 3:34 p.m. that day, which was a Friday. However, on June 6, no one appeared at the hearing on Rainbow's behalf, and the trial court issued an order granting the emergency injunction because it concluded that "[a]t no time has [Burns Harbor] authorized Rainbow to utilize the sewer main extension." (Appellant's App. p. 21).

Rainbow then filed a Motion to Set Aside Default Judgment pursuant to Indiana Trial Rule 60(B). In the motion, Rainbow's attorney explained that he and Pasternac failed to appear at the hearing on Burns Harbor's Emergency Motion for Injunctive Relief because, after the first day of trial on June 1, they had coordinated a tentative hearing date of June 13 with the court staff and did not know that the hearing was later formally scheduled, by Burns Harbor's attorney, for June 6 at 1:00 p.m.[1]

On June 13, 2006, the trial court held a hearing on Rainbow's Motion to Set Aside Default Judgment. Rainbow's attorney referred to the trial court's June 6th injunction as an "interim injunction." (June 13, 2006, Tr. p. 1). Likewise, Burns Harbor's attorney objected to proceeding under Trial Rule 60(B), arguing that the rule

---

1. By the time that Burns Harbor's attorney faxed a copy of its Emergency Motion for Injunctive Relief and notice of the hearing to Rainbow's attorney at 3:34 p.m. on the afternoon of Friday, June 2, Rainbow's attorney had already left town for the weekend. When he returned to his office on Monday, June 5, he saw the fax regarding the Burns Harbor litigation on his fax machine but apparently did not immediately read over it. He did not read it until Wednesday, June 7, the day after the hearing. Both attorneys should have handled this situation differently (Rainbow's attorney on appeal did not represent Rainbow at the trial court level). Rainbow's attorney should have reviewed the fax in a more timely manner, especially knowing that Burns Harbor would be filing an emergency motion and that the June 13th hearing date that he had discussed with the court staff was tentative. On the other hand, Burns Harbor's attorney should have called Rainbow's attorney as a professional courtesy, particularly in light of the expedited schedule, the fact that Rainbow's attorney had no say in setting the hearing, and the fact that the fax was sent late on a Friday afternoon. If he had called, Burns Harbor's attorney would have learned that Rainbow's attorney had a client meeting scheduled for June 6 at 1:00 p.m.

applies to final orders and judgments and that "there's been no finality here." (June 13, 2006, Tr. p. 2). The trial court proceeded under Trial Rule 60(B) but stated:

I understand the issue is whether your client should have to comply with that [CCTV] test. He's of the opinion [that Burns Harbor,] when they originally allowed him to take the steps, wasn't going to ... require that he perform that [CCTV] test. [Burns Harbor] is saying that they have—they will require that, and that's necessary. And that certainly is the issue that is in dispute in this case. And I understand that, and I can appreciate that. And that's the ultimate issue that we need to address and we'll address that in November.

(June 13, 2006, Tr. pp. 4–5). Rainbow's attorney informed the trial court that if Rainbow were given the opportunity to put on a defense, Pasternac would testify regarding "the authorization [Burns Harbor] gave him to turn [the permanent system] on after the mandrel test, and the fact that [Burns Harbor is] holding back the permit even though [Rainbow] complied with everything, and even though the vacuum test is more valid than the CCTV test for leakage." (June 13, 2006, Tr. p. 20).

After the hearing, the trial court issued an order denying Rainbow's Motion to Set Aside Default Judgment. The trial court found that Rainbow's failure to appear at the June 6th hearing on Burns Harbor's Emergency Motion for Injunctive Relief was the result of excusable neglect but that Rainbow had failed to establish the existence of a meritorious defense.[2] Specifically, the trial court concluded: "That the evidence is undisputed that [Rainbow] has not received a valid permit to connect

to [Burns Harbor's] sewer system and while [Rainbow] may have one or more remedies, connecting to the sewer system without the proper permit is not one." (Appellant's App. p. 30). Though it denied Rainbow's motion, the trial court did grant Rainbow an additional ten days in which to comply with the injunction, i.e., to complete the CCTV test.

Rainbow complied with the injunction and completed the CCTV test. On November 2, 2006, the parties appeared for the second day of the bench trial. After Burns Harbor's attorney suggested that a violation of Ordinance 172 had already been established and that the only issue remaining was professional and legal fees, Rainbow's attorney stated:

Your Honor, if my client has already been found in violation of the [ordinance] there's really no reason for us to be here today. This hearing is for my client to put on his defense. He's not had an opportunity to put on a defense. I understand there was an injunction filed, my understanding on that order, was that my client still had an opportunity to put on a defense. The [c]ourt simply ordered that because of the concerns of [Burns Harbor], under the understanding that my client would still be able to put on a defense and have the cause of action so to speak against [Burns Harbor] should he prevail. He's not had an opportunity to put on a defense. I would like some clarification as to the fact that he does have an opportunity today to defend his violation of the ordinance.

(Nov. 2, 2006, Tr. pp. 9–10). The trial court responded, "That's why you're here." (Nov. 2, 2006, Tr. p. 10).

**2.** Indiana Trial Rule 60(B) allows a trial court to relieve a party from a judgment or order by reason of excusable neglect if the party alleges a meritorious claim or defense. Burns Harbor challenged Rainbow's claim of excusable neglect at the trial court level but does not do so on appeal.

Rainbow then presented the testimony of James Gloy (Gloy), a pipelayer for D & M Excavating, the company that installed Rainbow's sewer system. Gloy testified that he was present on the day of the mandrel test, that he "mudded up" the temporary system, thereby forcing the activation of the permanent system, and that he was "pretty sure" that Nagai was present when the switchover took place. (Nov. 2, 2006, Tr. p. 23). Gloy also testified that the manhole vacuum test, which he performed on Rainbow's system, is more extensive than the CCTV test in checking for leakage. Finally, Gloy opined that if a CCTV test is going to be performed, it should be done before the system is activated because "once sewage goes through ... you have to flush the system out" before using the camera. (Nov. 2, 2006, Tr. p. 31).

Pasternac took the stand and testified that, on the day Rainbow's sewer system passed the mandrel test, Nagai "gave [him] the green light to convert the system" and that he "got [Nagai's] nod on the job to turn on the system." (Nov. 2, 2006, Tr. p. 53). When asked whether Nagai was lying when he testified that he never gave Rainbow permission to activate its permanent sewer line, Pasternac responded, "Yes. One hundred percent, he's lying." (Nov. 2, 2006, Tr. p. 65). Pasternac also testified that he contested some of Nagai's engineering fees on the day of the mandrel test and that he received a letter three days later informing him, for the first time, that a CCTV test was required.

On December 6, 2006, the trial court issued its Judgment. The trial court concluded that "[Burns Harbor's] demand for Judgment for specific performance is now moot as a result of [Rainbow's] compliance with this Court['s] Order of June 6, 2006[.]" (Appellant's App. p. 31). The trial court awarded Burns Harbor $2,600 in professional fees (including $560 in attorney fees), $6,675 in attorney fees incurred as a result of litigation, and court costs.

Rainbow now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

 On appeal, Rainbow argues that the trial court erred in ordering it to perform a CCTV test on its permanent sewer line without first hearing all of its evidence in opposition to the test and that the trial court erred in awarding damages and attorney fees. Burns Harbor responds that the issue of the propriety of requiring the CCTV test is moot in light of the fact that Rainbow has already performed the test and asks for an award of appellate attorney fees. Because Burns Harbor's mootness argument would be dispositive if correct, we address it first.

### I. *Mootness*

 Burns Harbor argues that even if the trial court erred in ordering Rainbow to perform the CCTV test before hearing all of the evidence, the propriety of requiring the CCTV test is a moot issue in light of the fact that Rainbow has already performed the test.[3] An appeal or issue is

---

**3.** Burns Harbor also seeks to invoke the doctrines of *res judicata* and law of the case. Neither of those doctrines applies to the situation before us. "The doctrine of *res judicata* bars a later suit when an earlier suit resulted in a final judgment on the merits, was based on proper jurisdiction, and involved the same cause of action and the same parties as the later suit." *Reed v. State,* 856 N.E.2d 1189, 1194 (Ind.2006). At this point in the litigation, we have a trial court judgment and an appeal, not an "earlier suit" and a "later suit." "The law of the case doctrine mandates that an appellate court's determination of a legal issue binds the trial court and ordinarily restricts the court on appeal in any

moot when: (1) it is no longer "live" or when the parties lack a legally cognizable interest in the outcome; (2) the principal questions in issue have ceased to be matters of real controversy between the parties; or (3) the court on appeal is unable to render effective relief upon an issue. *Matter of Tina T.*, 579 N.E.2d 48, 52 (Ind. 1991). Burns Harbor argues that because Rainbow has already performed the CCTV test, "there is no 'live' issue at stake." (Appellee's Br. p. 10). We disagree.

The propriety of requiring the CCTV test is not a moot issue because whether Rainbow should have been required to perform the CCTV test bears greatly on the appropriate measure of damages and attorney fees in this case. Specifically, if the trial court would have concluded that Rainbow had permission to connect after it passed the mandrel test and therefore Burns Harbor wrongfully required Rainbow to perform the CCTV test, the trial court's award of damages and attorney fees would likely have been different. That is, if the trial court would have ruled in Rainbow's favor on the issue of the CCTV test, it would have had to calculate its damages award in light of the cost of the CCTV test to Rainbow, the inspection costs for the test, and the attorney fees attributable to that issue.

Furthermore, in the interest of basic fairness, we note that even though the trial court wrote in its December 6, 2006, Judgment that "[Burns Harbor's] demand for Judgment for specific performance is now moot as a result of [Rainbow's] compliance with this Court['s] Order of June 6, 2006[,]" (Appellant's App. p. 31), comments made on the second day of trial on November 2, 2006, tell a different story. Rainbow's attorney stated:

Your Honor, if my client has already been found in violation of the [ordinance] there's really no reason for us to be here today. This hearing is for my client to put on his defense. He's not had an opportunity to put on a defense. I understand there was an injunction filed, my understanding on that order, was that my client still had an opportunity to put on a defense. The [c]ourt simply ordered that because of the concerns of [Burns Harbor], under the understanding that my client would still be able to put on a defense and have the cause of action so to speak against [Burns Harbor] should he prevail. He's not had an opportunity to put on a defense. I would like some clarification as to the fact that he does have an opportunity today to defend his violation of the ordinance.

(Nov. 2, 2006, Tr. pp. 9–10). The trial court responded, "That's why you're here." (Nov. 2, 2006, Tr. p. 10). In other words, until the trial court issued its Judgment on December 6, 2006, all indications were that the propriety of requiring the CCTV test was still a live issue in this case.

## II. *Injunction*

Rainbow maintains that the trial court should not have ordered it to perform the CCTV test before hearing all of the evidence. We agree. On June 1, 2006, the first day of trial, Burns Harbor was able to finish questioning its only witness, Nagai, but because of time constraints, Rainbow was only able to present a few of its exhibits and none of its own witnesses. A second day of trial was set for November 2, 2006. Nonetheless, on June 6, 2006, in response to Burns Harbor's Emergency Motion for Injunctive Relief, the trial court

subsequent appeal involving the same case and relevantly similar facts." *Hopkins v. State*, 782 N.E.2d 988, 990 (Ind.2003). Here,

no appellate court has determined any of the legal issues.

issued its order requiring Rainbow to perform the CCTV test. Rainbow challenged the order in a Motion to Set Aside Default Judgment. The trial court concluded that Rainbow had missed the June 6th hearing by reason of excusable neglect but that Rainbow had failed to allege a meritorious defense. In this regard, the trial court erred.

In order to obtain relief under Indiana Trial Rule 60(B) based on excusable neglect, a party must allege a meritorious claim or defense. The meritorious defense requirement only requires the movant to make a *prima facie* showing that a different result would have obtained had the matter been tried on the merits. *Anderson v. State Auto Ins. Co.*, 851 N.E.2d 368, 371 (Ind.Ct.App.2006). The movant need not prove absolutely the existence of a meritorious defense. *Id.* Rather, the movant need only "present evidence that, *if credited,* demonstrates that a different result would be reached if the case were retried on the merits and that it is unjust to allow the judgment to stand." *Outback Steakhouse of Florida, Inc. v. Markley,* 856 N.E.2d 65, 73–74 (Ind.2006) (quoting *Smith v. Johnston,* 711 N.E.2d 1259, 1265 (Ind.1999)) (emphasis in original). Rainbow did that in this case. Specifically, during the hearing on Rainbow's Motion to Set Aside Default Judgment, Rainbow's attorney informed the trial court that Pasternac was prepared to testify that even though Rainbow did not have a formal, written permit from Burns Harbor, it was given permission by Nagai to switch over to the permanent system after the mandrel test. If the trial court would have heard that testimony *and credited it,* a different result would have been reached.

Burns Harbor argues that Rainbow waived any argument with regard to the trial court's denial of its Motion to Set Aside Default Judgment because it failed to appeal that denial within thirty days. As a general matter, Burns Harbor is correct. Indiana Trial Rule 60(C) provides that "[a] ruling or order of the court denying or granting relief, in whole or in part, by motion under subdivision (B) of this rule shall be deemed a final judgment, and an appeal may be taken therefrom as in the case of a judgment." In turn, Indiana Appellate Rule 9(A)(1) states, "A party initiates an appeal by filing a Notice of Appeal with the trial court clerk within thirty (30) days after the entry of a Final Judgment." In a usual case, a party would be required to appeal from the denial of a motion to set aside default judgment within thirty days. But this is not a usual case.

Here, it was established during the hearing on Rainbow's Motion to Set Aside Default Judgment that the trial court's grant of Burns Harbor's Emergency Motion for Injunctive Relief was not meant to settle the issue of the CCTV test. First, Rainbow's attorney set the record by referring to the trial court's June 6, 2006, injunction as an "interim injunction." (June 13, 2006, Tr. p. 1). Burns Harbor's attorney then objected to the proceeding, arguing that Trial Rule 60(B) only applies to final orders and judgments and that "there's been no finality here." (June 13, 2006, Tr. p. 2). Finally, the trial court stated:

> I understand the issue is whether your client should have to comply with that [CCTV] test. He's of the opinion [that Burns Harbor,] when they originally allowed him to take the steps, wasn't going to . . . require that he perform that [CCTV] test. [Burns Harbor] is saying that they have—they will require that, and that's necessary. And that certainly is the issue that is in dispute in this case. And I understand that, and I can

appreciate that. *And that's the ultimate issue that we need to address and we'll address that in November.*

(June 13, 2006, Tr. pp. 4–5) (emphasis added). These comments, particularly by the trial court, made it clear that the parties would be returning to the issue of the CCTV test on the second day of trial on November 2, 2006. To dispose of this case based on the strict language of Indiana's rules of court would be to elevate form over substance, which we generally will not do. *State ex rel. Attorney Gen. v. Lake Superior Court*, 820 N.E.2d 1240, 1252 (Ind.2005) ("We are unwilling to fortify the armory of those who attack the law as famous for its ability to elevate form over substance."), *reh'g denied, cert. denied* 546 U.S. 927, 126 S.Ct. 398, 163 L.Ed.2d 276 (2005).

We conclude that the trial court erred in ordering Rainbow to perform the CCTV test without first hearing all of its evidence in opposition and that remand is necessary. While it is not our role to weigh the evidence or judge the credibility of the witnesses, we find it appropriate to make several observations in remanding the case to the trial court.

Rainbow's theory is that Burns Harbor only sought to require the CCTV test after Pasternac disputed several of the town's engineering and legal bills, that is, in retaliation. There is evidence to support this theory. In letters dated November 23, 2004, December 23, 2004, and February 24, 2005, and in sanitary board meetings on December 15, 2004, and February 23, 2005, the only tests Nagai mentioned were the low pressure air test, the mandrel test, and the manhole vacuum test. Most notably, at the sanitary board meeting on February 23, 2005, Nagai stated, "Then once you pass the [mandrel] test you can make the switch over." (Appellant's App. p. 93). Furthermore, Gloy, a pipelayer for D & M

Excavating, testified that (1) the manhole vacuum test, which he performed on Rainbow's system, is more extensive than the CCTV test in checking for leakage, (2) he was "pretty sure" that Nagai was present when the switchover took place, (Nov. 2, 2006, Tr. p. 23), and (3) if a CCTV test is going to be performed, it should be done before the system is activated because once sewage goes through ... you have to flush the system out" before using the camera. (Nov. 2, 2006, Tr. p. 31). Finally, Pasternac testified that Nagai gave Rainbow permission to activate its permanent system on the day of the mandrel test and that, to the extent Nagai testified otherwise, he was lying.

There is evidence that, *if credited,* could support a conclusion that the CCTV test was unnecessary and wrongfully required. We therefore remand this case to the trial court with instructions to re-evaluate the propriety of requiring the CCTV test in light of all of the evidence presented and, if necessary, to adjust its award of damages and attorney fees. We also note that because of this disposition, it would be premature for us to address Rainbow's challenge to the trial court's original award of damages and attorney fees. Finally, because Rainbow has earned a reversal of the trial court's judgment, we deny Burns Harbor's request for appellate attorney fees.

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred in ordering Rainbow to perform a CCTV test on its permanent sewer line without first hearing all of Rainbow's evidence in opposition and that this issue is not moot. We therefore reverse the judgment of the trial court and remand this cause for further proceedings consistent with this opinion. We also deny

Burns Harbor's request for appellate attorney fees.

Reversed and remanded.

KIRSCH, J., and MAY, J., concur.